UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| **BRENDA JONES,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:05CV84MLM |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart ("Defendant") denying the applications for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § § 401 et seq., and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq., filed by Plaintiff Brenda Jones ("Plaintiff"). Plaintiff has filed a Brief in Support of the Complaint. Doc. 16. Defendant has filed a Brief in Support of the Answer. Doc. 20. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc.17.

### I.
### PROCEDURAL HISTORY

Plaintiff filed applications for disability benefits and SSI on April 28, 2003, and April 22, 2003, respectively, in which applications she alleged that she was disabled due to diabetes and nerve damage to her legs with a disability onset date of April 18, 2003. Tr. at 14, 89, 95. Her applications were denied on August 7, 2003. Tr. at 54-57. A hearing was held before Administrative Law Judge ("ALJ") H. Lloyd Kelly III on February 3, 2004, at which hearing Plaintiff, Plaintiff's cousin, and a Vocational Expert ("VE") testified. Tr. at 426-516. On November 9, 2004, the ALJ found that Plaintiff was not under a disability as defined by the Act. Tr. at 14-22. On April 19, 2005, the

Appeals Council denied Plaintiff's Request for Review. Tr. at 4-6. The decision of the ALJ stands, therefore, as the final decision of the Commissioner.

## II.
## MEDICAL RECORDS

Theodore Roberts, M.D., reported that he saw Plaintiff on April 22 and May 1, 2002. Tr. at 319-20.

Dr. Roberts's notes reflect that he saw Plaintiff on February 28, 2003, for chronic management of diabetes and allergic rhintis. Plaintiff's blood sugar levels would not register on the machine and Plaintiff was taken to Missouri Delta Medical Center. Tr. at 317.

Records of the Missouri Delta Medical Center reflect that Plaintiff, who has Type I diabetes mellitus, presented to the emergency room on February 28, 2003, complaining of leg and chest pain and generalized weakness and reporting that she was out of insulin for the past five months. Tr. at 362.

Jay A. Hudson, M.D. of the Missouri Delta Medical Center reported on March 3, 2003, that Plaintiff was admitted on February 28, 2003; that she was thirty-nine years old; that she had been diagnosed with diabetes three years earlier; that her treating doctor was Dr. Roberts; that her sugar had been out of control for the past year; that she does not check her sugar at home; that in the emergency room her sugar was in excess of 600; that she had been switched to "bid" insulin, pen insulin and she takes 20 in the morning and 15 in the evening" and that she "quit taking insulin for a while"; that Plaintiff admitted to being non-compliant; that Plaintiff said that the pain which she has in her feet has limited her ability to work because she spends most of her day standing; that she has had to take many sick days because of the pain; that Plaintiff described the pain in her feet as a "constant dull throb, worse on the bottoms of her feet, but involving the toes, tops of her feet and

extending partly up her anterior tibial region"; that Plaintiff said she had some recurrent blurring of her vision; and that she had lost approximately sixty pounds over the last three years. Tr. at 365-67.

Muhannad Al-Kilani, M.D., a board certified endocrinologist and diabetologist, reported on March 3, 2003, that Plaintiff was seen in the emergency room; that her diabetes was not controlled; that she said her sugar had been out of control for the past year; that she quit taking her insulin for awhile; that there was no evidence of diabetic ketoacidosis; that this doctor talked to Plaintiff about her disease and the need to eat and take insulin shots on time and the potential acute and chronic complications of uncontrolled diabetes; and that the plan was to increase Plaintiff's insulin shots. Tr. at 368-69.

Riyadh J. Tellow, M.D., reported on March 3, 2003, that Plaintiff limped when she walked due to pain in her feet; that she was "somewhat unsteady"; that her Romberg sign was negative; that she has significant pain and tingling sensation in both legs and evidence of neuropathy with distal sensory loss in the legs; that the neuropathy was "most likely associated with diabetes"; and that Plaintiff should take Neurontin for pain in her legs and take Elavil at night because she was having difficulty sleeping. Tr. at 371.

A discharge summary from Missouri Delta Medical Center, dated March 4, 2003, states that upon discharge Plaintiff was stable; that Plaintiff should follow-up with Dr. Al-Kilani, Riyadh J. Tellow, M.D., and Dr. Roberts; and that she was scheduled to have the services of a diabetic educator. Tr. at 364.

Dr. Roberts's records reflect that he saw Plaintiff on March 11, 2003, for chronic management of IDDMII, allergic rhintis, depression, and neuropathy. Tr. at 315.

Records of Missouri Southern Healthcare reflect that Plaintiff was seen on an emergency basis on April 14, 2003, and that the clinical impression was urinary tract infection and neuropathy.

3

Records reflect that Plaintiff arrived by ambulance; that she was disoriented and confused; and that Plaintiff had elevated blood sugar levels. Records further reflect that Plaintiff was discharged the next day with a recommendation that she follow a diabetic diet and pharmaceutical management. Tr. at 304-14.

Dr. Roberts's records reflect that Plaintiff was seen on April 21, 2003, for follow-up on blood sugars and diabetic neuropathy and that Plaintiff was given a work excuse for diabetic neuropathy. Tr. at 300-301.

Plaintiff reported on a Disability Report dated April 25, 2003, that she is 5'1" tall; that she weighed 134 pounds; that she stopped working April 3, 2003, because of pain; that she completed the twelfth grade; and that she did not attend special education classes.[1] Tr. at 185-92.

Records of Missouri Delta Medical Center, dated May 9, 2003, reflect that Plaintiff presented with pain in her legs and lost feeling in her arms and legs; that she complained of "bad pains" in her legs, feet, arms and hands; that she stated that this pain had been going on for awhile; that Plaintiff's blood sugars upon admission were 165; that the clinical impression was myalgia or fatigue; and that she was prescribed naproxen. Tr. 353-58. Mahmoud Ziaee, M.D., reported on this date that examination of Plaintiff in regard to low abdominal pain showed Plaintiff had "no abnormality of the pelvis, visualized uterus and adnexal area noted." Tr. at 358.

Plaintiff completed a Claimant Questionnaire, dated May 16, 2003, in which she reported that her legs and feet hurt constantly; that it hurts to stand or walk; that she takes her prescribed medicine; that it is difficult for her to sleep due to pain; that she has to have help getting out of the bathtub; that her son has to help her around the house; that she cannot fry foods like she use to; that she sends

---

[1] Although Plaintiff stated on this questionnaire that she was not in special education classes, she testified at the hearing that she was in special education all twelve years of her schooling. Tr. at 435.

4

people to the store for her; that she is able to vacuum, dust, wash dishes and clean out the tub; that she needs someone to vacuum, dust and clean out the tub; that she goes shopping with her cousins, she goes to Six Flags; that she does her own cooking and cleaning; that she watches television and cannot do so when she is in pain; that she reads the Bible and magazines; that she drives to work which is twenty miles each way; that it is hard for her to drive because of pain in her legs; that she gets out of the house to do errands, to go to work, and to go to the doctor; that she cooks for her son when she can; and that she goes to church when she is not in too much pain. Tr. at 150-54.

Ann Schamburg, Family Nurse Practitioner, reported that Plaintiff was seen on April 20, 2003; that she was "Alert, Active, in NAD"; that the impression was allergic rhinitis, IDDMII, depression, and peripheral neuropathy; and that Plaintiff was to be referred to Dr. Al-Kilani and Dr. Tallow regarding her diabetic neuropathy. Tr. 299.

Dr. Roberts's records reflect that Plaintiff was seen on May 5, 2003, for IDDMII, allergic rhintis, depression, and diabetic neuropathy; that she was alert; and that she had bilateral foot pain. Tr. at 298.

Dr. Roberts's records of May 9, 2003, reflect that Plaintiff was seen for follow-up on IDDMII and HTN and that Plaintiff stated that her lower legs and feet were very painful. Tr. at 296.

Records of Missouri Delta Medical Center reflect that Plaintiff was seen on May 9, 2003 , at which time she complained of pains in her legs, feet, arms, and hands which pain she said had been going on for awhile. It was reported that she was alert and coherent. Tr. at 356.

In a letter to Dr. Roberts, dated May 19, 2003, Dr. Tellow, a neurologist, stated that Plaintiff had diabetes which was poorly controlled; that Plaintiff reported that Nuerontin had "not helped her much"; that she is on insulin; that her latest blood sugar was 170; that examination showed tenderness in Plaintiff's arms and legs with deep palpation, that pulses are present, and that there was no motor

5

weakness; that an MRI of Plaintiff's brain was unremarkable; that her urine for heavy metals was negative; and that Dr. Tellow's assessment was painful sensory neuropathy associated with diabetes, insulin requiring diabetes which is not well controlled, and tubal ligation. Dr. Tellow's suggestions included that Plaintiff continue increase Neurontin, continue Amitriptyline and Ultracet and that Plaintiff have strict diabetes control. Tr. at 349.

Nurse Schamburg reported that Plaintiff was seen on May 28, 2003; that Plaintiff was "Alert, Active, in Nad"; that the impression was allergic rhinitis, IDDMII, depression, peripheral neuropathy, and bilateral foot pain; and that Plaintiff was prescribed Ultram and Neurontin. Tr. at 294-95.

Dr. Al-Kilani, of Missouri Delta Endocrinology & Diabetes Center, reported that he saw Plaintiff on June 2, 2003; that examination showed that Plaintiff was in no acute distress, that she weighed 142 and her height was 5'1/2"; and that she was conscious and oriented; that her sugar was 260; that Plaintiff's Type I diabetes was not controlled; and that he was increasing Plaintiff's insulin dosage. Tr. at 208, 347.

Nurse Schamburg reported that Plaintiff was seen on June 4, 2003; that she was "Alert, Active, in Nad"; that the impression included allergic rhinitis, IDDMII, depression, diabetic neuroptathy, and HTN; and that the plan included giving Plaintiff a work excuse for June 4 to June 18, 2003 and "RBS." Tr. at 292-93.

Records of St. Alexius Hospital, dated June 8, 2003, reflect that Plaintiff arrived via ambulance complaining of diarrhea, nausea, vomiting, and pain in both legs. Records reflect that Plaintiff's glucose level was 212. A physical examination showed, in regard to Plaintiff's extremities, that they were not tender, she had normal ROM, and no pedal edema. Tr. at 331.

6

Nurse Schamburg reported that Plaintiff was seen on June 9, 2003, at which time she was "Alert, Active, in Nad"; the impression was allergic rhinitis, IDDMII, depression, diabetic neuropathy, and HTN; and that the plan was for Plaintiff to take Immodium, Phenergan, Prev-Pac. Tr. at 290-91.

Dr. Robert's and Nurse Schamburg's records reflect that Plaintiff was seen on July 1, 11, 22 and 29, August 11 and 22, September 3 and 18, 2003, for chronic management of DDMII, allergic rhintis, depression and diabetic neuropathy. Tr. at 197-202, 286-89.

Dr. Al-Kilani reported on July 30, 2003, that Plaintiff was in no acute distress; that she was conscious and oriented; that she moved her limbs symmetrically; that her glucose was 159; that she did not keep "many of her appointments"; that she did not bring her sugar records with her; that her diabetes mellitus was not controlled; that he talked to Plaintiff about eating on time, about the need to check her sugar three to four times a day, and about the need to keep records. Tr. at 207.

Medical records reflect that Plaintiff had cataract surgery in September 2003. Tr. at 204.

Dr. Roberts reported on October 15, 2003, that Plaintiff presented for management of uncontrolled diabetic neuropathy; that Plaintiff had a "history of numbness/decreased sensation/ increased pain to legs/feet"; that Plaintiff was wearing house shoes due to pain while wearing shoes; that Plaintiff was in "mild distress related to neuropathy in lower extremities"; that Plaintiff was negative for depression; and that his assessment was "IDDM," diabetic neuropathy-legs/feet, migraine cephalgia, allergic rhinitis, and influenza immunization. Tr. at 195.

Records from Dr. Robert's nurse reflect that Plaintiff was seen on December 13, 2003; that the assessment on this date was diabetic neuropathy-legs/feet, migraine cephalgia, and allergic rhinitis; that Plaintiff was to continue taking Neurontin, Elavil; and that Plaintiff was switched from Ultracet to Ultram. Tr. at 194.

Dianne Jackson, R.N., M.S.N, F.N.P.-C, who worked with Dr. Roberts, reported that Plaintiff was seen on December 16, 2003, at which time Plaintiff presented for flu and "management for IDDM/Diabetic Neuropathy - legs bil." Nurse Jackson's notes of this date reflect that Plaintiff was negative for depression and "Positive for Type II DM - fair control - under care of" Dr. Al-Kilani. Tr. at 194.

Nurse Schamburg, who worked with Dr. Roberts, completed a Diabetes Mellitus Residual Functional Capacity ("RFC") Questionnaire on March 21, 2005. Nurse Schamburg reported in this questionnaire that Plaintiff's diagnosis was Type II diabetes mellitus and diabetic neuropathy; that her prognosis is fair; that Plaintiff has anxiety which was not diagnosed by a psychiatrist; that Plaintiff's symptoms include fatigue and difficulty walking; that she can sit between fifteen minutes and one hour at a time[2]; that Plaintiff experiences pain frequently in a typical workday; that she is incapable of even low stress jobs; that she can walk one bock without having to rest; that she can stand/walk less than two hours in an 8-hour workday; that she needs a job which permits shifting positions at will; that she needs to take unscheduled breaks during an 8-hour workday and that these breaks will occur every two to three hours; that during prolonged sitting Plaintiff's legs should be elevated; that she rarely can lift less than ten pounds, ten pounds, and twenty pounds; that she never can lift fifty pounds; that she can rarely twist and climb ladders and stairs; that she occasionally can stoop/bend and crouch/squat; that she does not have significant limitations with regard to fingering; that she should avoid moderate exposure to extreme cold and heat, high humidity, wetness, and perfumes; that she should avoid all exposure to cigarette smoke, soldering fluxes, solvents/cleaners, fumes, odors, gases,

---

[2] The questionnaire is completed in an ambiguous manner in regard to Plaintiff's ability to sit and stand during an 8-hour workday. Plaintiff suggests that the questionnaire says that she can sit for fifteen minutes up to an hour and that she can stand no more than fifteen minutes at a time. However, in regard to sitting the evaluator circled both fifteen minutes and 2 hours and in regard to standing the evaluator circled both fifteen minutes and 1 hour. Tr. at 423.

dust, and chemicals; and that she is likely to be absent from work more than four days a month. Tr. at 422-425.

# V.
# LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § § 416.920(f), 404.1520(f). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person's with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however,

9

remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) (holding that the at Step 5 the burden of production shifts to the Commissioner, although the Commissioner is to required to reestablish the RFC which the claimant must prove at Step 4).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial

evidence"). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving

that he has a disabling impairment. 42 U.S.C. § 423(d)(1); <u>Pickner v. Sullivan</u>, 985 F.2d 401, 403 (8th Cir. 1993); <u>Roach v. Sullivan</u>, 758 F. Supp. 1301, 1306 (E.D. Mo. 1991).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. <u>Nevland</u>, 204 F.3d at 857 (citing <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. <u>Id</u>. The Commissioner has to prove this by substantial evidence. <u>Warner v. Heckler</u>, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. <u>Nevland</u>, 204 F.3d at 857.

# VI.
# DISCUSSION

As stated above, the issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff is engaged in substantial gainful activity and, therefore, is not disabled. <u>Onstead</u>, 962 F.2d at 804. The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (9th Cir. 1991). Thus, even if

there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff contends, contrary to the finding of the ALJ, that she meets Listing 9.08(A), diabetes mellitus with neuropathy, and that, therefore, she is disabled within the meaning of the Act. Plaintiff further contends that the ALJ erred at Step 5 of the sequential analysis upon determining her RFC. Plaintiff also contends that the ALJ improperly determined that she was not credible and, in particular, that the ALJ should not have considered her non compliance and her ability to perform chores as detracting from her credibility. Plaintiff also alleges that the hypothetical which the ALJ posed to the VE was improper as did not include her complaints of severe pain, her alleged necessity for taking pain medication, her alleged problems with her joints, or limitations in her intellectual ability.

The ALJ found that while Plaintiff has severe impairments of diabetes mellitus, diabetic neuropathy, and a history of right eye cataract, he found that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4. In particular the ALJ found that Plaintiff does not meet the Listing of Impairments for diabetes mellitus. Further, the ALJ concluded that Plaintiff has the Residual Functional Capacity ("RFC") to lift no more than fifteen pounds and that she can carry no more than ten pounds.[3] The ALJ concluded, based on the testimony of a Vocational Expert ("VE") that Plaintiff could make a vocational adjustment to jobs which exist in significant numbers in the national economy.

---

[3] The court notes that the ALJ's finding in regard to Plaintiff's RFC is somewhat ambiguous. Additionally, the ALJ failed to state how frequently Plaintiff can lift fifteen pounds and how frequently she can lift ten pounds. The ALJ further failed to specify whether Plaintiff has the RFC for light work. As the court is remanding this matter for reasons stated below, the court suggests that on remand, if the ALJ finds that Plaintiff is not disabled that he set forth her RFC with greater clarity and in a manner consistent with the Regulations.

Plaintiff argues that the ALJ should have found her disabled because she meets the Listing of Impairments at § 9.08 for diabetes mellitus. Section 9.08 states that to be found disabled because of diabetes mellitus a claimant must have diabetes mellitus with:

> A.    Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C);
>
> B.    Acidosis occurring at least on the average of once very 2 months documented by appropriate blood chemical tests (ph or PCO2 or bicarbonate levels); or
>
> C.    Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

After considering the medical evidence the ALJ concluded that Plaintiff does not meet Listing § 9.08. In particular the ALJ considered records of Plaintiff's February 2003 hospital admission which reflect that Plaintiff's diagnosis was insulin dependent diabetes mellitus, probably Type I, not controlled, with hyperosmolality and ketosis and diabetic neuropathy; that Plaintiff was begun on an insulin drip with was subsequently converted to a sliding scale coverage with good control; that Plaintiff was prescribed Neurontin for leg pain; and that Plaintiff's condition was stabilized when she was released. Tr. at 16. The ALJ further considered the records of Dr. Roberts between March 11 and December 16, 2003, including Dr. Roberts's report of December 2003 wherein he stated that Plaintiff had full range of all her extremities and that she ambulated with a steady gait. The ALJ considered that during this period Dr. Roberts reported that Plaintiff was responsive to stimuli and that Plaintiff was provided pharmaceutical management for her diabetes mellitus. Tr. at 16-17. The ALJ further considered records of Plaintiff's May 2003 emergency care which reflect that her glucose levels were elevated at that time and that she was provided pharmaceutical management; records of Dr. Tellow for May 2003 in which Dr. Tellow reported, among other things, that there was no motor loss appreciated, that Plaintiff was continued with a diagnosis of painful sensory neuropathy

14

associated with diabetes, and that she was prescribed an increased dosage of Neurontin; and records of Dr. Al-Kilani's consultive examination which reflect that Plaintiff reported symptoms of pain and numbness in her feet and elevated sugar levels, that Dr. Al-Kilani reported an elevated glucose level and no adverse findings, and that Plaintiff was prescribed an increase in her insulin dosage. Tr. at 18. The ALJ further considered that records of June 2003 from St. Alexius Hospital showed that Plaintiff complained of pain; that Dr. Abdullah's findings upon examination were within normal limits; and that Plaintiff's glucose was 212. Tr. at 18. The ALJ also considered Dr. Al-Kilani's report of July 30, 2003, when he saw Plaintiff for follow-up and that Dr. Al-Kilani reported that Plaintiff was negligent in keeping scheduled appointments and did not provide a records of her blood glucose readings. A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility. Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain. Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989) (holding that the ALJ can discredit subjective complaints of pain based on claimant's failure to follow prescribed course of treatment); Weber v. Harris, 640 F.2d 176, 178 (8th Cir. 1981). The ALJ also considered that Dr. Al-Kilani reported on July 30, 2003, that Plaintiff was not in acute distress; that Plaintiff's glucose was elevated at 159; that her diabetes mellitus was not controlled; that Plaintiff was advised to write down her sugar readings; and that the doctor recommended greater compliance with Plaintiff's treatment regimen. Tr. at 18. The ALJ also noted that Plaintiff sought opthamological care for cataracts; that she had surgery on her right eye cataract; and that records of September 2003 demonstrate normal healing. Tr. at 18.

The record does not reflect that Plaintiff was seen by Dr. Al-Kilani, who is a specialist in endocrinology and diabetes after July 2003. The ALJ, however, relied heavily on Dr. Al-Kilani's

15

records. Subsequent to Dr. Al-Kilani's last report, in December 2003, records reflect that Nurse Jackson, who works with Dr. Roberts, reported that Plaintiff's diabetes mellitus was under "fair control." Also, in March 2005, after the date of the ALJ's decision but prior to the decision of the Appeals Council, Nurse Schamburg, who likewise works for Dr. Roberts, completed a RFC Questionnaire. In this questionnaire, Nurse Schamburg opined, among other things, that Plaintiff could sit between fifteen minutes and one hour at a time, that she requires unscheduled work breaks, that her legs must be elevated during prolonged sitting, and that she can rarely lift less than ten pounds.[4] Plaintiff's RFC as suggested in Nurse Schamburg's questionnaire is inconsistent with the finding of the ALJ and is less that than that required for even light work. Moreover, Plaintiff's need, as stated by Nurse Schamburg, to take unscheduled breaks, arguably would preclude all work. Nurse practitioners are not "acceptable medical source(s)" for purposes of 20 C.F.R. § 404.1513(a). Their opinions, however, may be considered as "other" medical sources. Id. at (d)(1). "In addition to evidence from the acceptable medical sources ... [an ALJ] may also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work. Other sources include, but are not limited to--(1) Medical sources not listed ... nurse-practitioners ...and therapists." Id.

The court finds it significant that the opinion of Nurse Schamburg is the only professional who evaluated Plaintiff's RFC. Nurse Jackson did not directly address Plaintiff's motor functions as affected by diabetic neuropathy. While Dr. Roberts noted on October 15, 2003, that Plaintiff had diabetic neuropathy and while Dr. Al-Kilani noted on July 30, 2003, that Plaintiff's limbs moved

---

[4] The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 416.967(a). Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251,*6 (SSA).

16

symmetrically, neither of these doctors opined regarding the affect of Plaintiff's diabetic neuropathy on her motor functions. As such, it cannot be said that the record is supported by substantial evidence in regard to the ALJ's decision that Plaintiff does not meet or equal Listing § 9.08, ¶ A. Considering the incompleteness of the record discussed above, the court finds that the record is insufficiently developed. As such, the court finds that the decision of the ALJ is not supported by substantial evidence on the record as it now stands. The court will, therefore, reverse this matter and remand it to the ALJ so that the record can be fully developed in a manner consistent with this decision. Upon remand the ALJ should recontact Dr. Al-Kilani or obtain the opinion of a consulting/examining doctor and request that the doctor examine Plaintiff, obtain tests if necessary, and opine in regard to whether she has neuropathy demonstrated by significant and persistent disorganization of motion function in two extremities resulting in sustained disturbance or gross and dextrous movements, or gait and station. It would further be advisable for the ALJ to request that Dr. Al-Kilani or other qualified medical professional address Plaintiff's RFC.

Because the court is reversing and remanding this matter it need not address other issues which Plaintiff has raised.[5]

---

[5] The court notes that as the ALJ's RFC finding was ambiguous, it cannot be said whether his hypothetical to the Vocational Expert was consistent with his finding of Plaintiff's RFC. An ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations but only those which he finds credible. Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). A hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence). In any case, resort to the Medical-Vocational Guidelines is appropriate when there are no non-exertional impairments that substantially limit the ability of a plaintiff to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. See Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical

# VII.
# CONCLUSION

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ is directed to fully develop the record in a manner consistent with this court's opinion. The court stresses that upon reversing and remanding this matter it does not mean to imply that the Commission should return a finding of "disabled." The court is merely concerned that the Commissioner's final determination, as it presently stands, is not supported by substantial evidence on the record as a whole.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in her Brief in Support of Complaint is **GRANTED,** in part, and **DENIED**, in part. [Doc. 16]

**IT IS FURTHER ORDERED** that the relief which Defendant seeks in her Brief in Support of the Answer is **GRANTED,** in part, and **DENIED,** in part [Doc. 20]

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will issue contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

**IT IS FURTHER ORDERED** that upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

---

Vocational Guidelines. See Robinson, 956 F.2d at 839. If, however, the claimant is also found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. See id. Thus, on remand should the ALJ find that Plaintiff has non-exertional impairments, those limitations should specifically be included in a hypothetical to a vocational expert.

/s/ Mary Ann L. Medler  
MARY ANN L. MEDLER  
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of March, 2006.